IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | : | |
| Plaintiff, | : | |
| v. | : | Criminal Action No. 08-37-JJF |
| IRA BLAND, | : | |
| Defendant. | : | |

### GOVERNMENT'S MEMORANDUM OF LAW IN OPPOSITION TO DEFENDANT'S MOTION TO SUPPRESS

On the morning of February 9, 2008, Kevin Coverdale called 911 to report that a man, later identified as Defendant Ira Bland, was sitting in a vehicle in the area of 12th and Bowers Streets in Wilmington, Delaware. Mr. Coverdale informed the 911 operator that this man had previously shot his son. Members of the Wilmington Police Department ("WPD") responded to the area of 12th and Bowers Streets, where they encountered Mr. Coverdale. Mr. Coverdale identified the Defendant, who was sitting in a gray Pontiac Bonneville. Based on the information provided by Mr. Coverdale, the officers approached Defendant to engage in an investigative Terry stop. During this stop, Defendant Bland indicated that he had a gun in his pocket. The officers secured a Hi-Point, model C-9 9mm pistol, which was found in the left side of Defendant's waistband.

In his pretrial motion to suppress (the "Motion") (D.I. 24), Defendant asserts that the officers lacked the reasonable suspicion required to perform an investigative Terry stop and frisk. (Mot. ¶ 3). Accordingly, Defendant contends that all evidence obtained as a result of this stop should be suppressed. (Id. ¶ 4).

Defendant's Motion should be denied because the WPD officers did in fact have the necessary reasonable suspicion to perform the investigative stop and frisk. Mr. Coverdale identified himself and provided detailed information to the 911 operator regarding Defendant's identity, location, and previous criminal activity. Moreover, upon the officers' arrival at the scene, Mr. Coverdale further identified Defendant as the individual suspected in his son's shooting. Lastly, the frisk of Defendant was appropriate for officer safety, especially in light of defendant's admission to possessing a gun. Therefore, the government respectfully submits that Defendant's motion should be denied.

## PROPOSED FINDINGS OF FACT

On February 9, 2008, at approximately 11:59 a.m., Kevin Coverdale called 911 in Wilmington, Delaware. (Ex. B).[1] Mr. Coverdale requested the assistance of a detective who was familiar with a shooting that took place on December 31, 2007, at a barbershop located at 23rd and Washington Streets. (Id. at 1). He explained to the dispatcher that, "the guy that did the shooting is down here at the shop waiting to get his car, his windows tinted on his car." (Id.). Mr. Coverdale then stated that the person in question had previously shot his son. (Id.). Mr. Coverdale also provided further information about the individual's location and description, stating that he was at the tint shop on 12th Street near Gander Hill, was wearing a yellow jacket with markings on it, and was driving a gray Pontiac Bonneville. (Id. at 1-2). Before ending the call to 911, Mr. Coverdale also provided his name to the operator. (Id. at 2).

---

[1] All references to exhibits refer to exhibits moved into evidence at the August 13, 2008 hearing on Defendant's Motion.

2

The police dispatcher then radioed Officers Guy DeBonaventura and Matthew Hazzard, the C platoon officers for the 13th District in Wilmington. (Tr. at 13).[2] The dispatcher asked the officers respond to the tint shop at East 12th and Bowers Streets explaining that "[a] Mr. Coverdale called[,] he says his son is a victim of a IX that occurred December 31st and the suspect is there at the [t]int [s]hop." (Ex. B at 2). "IX" is the police code for a homicide. (Tr. at 14).[3] The dispatcher went on to explain over the radio that Mr. Coverdale reported "a suspect for an IX[,] I don't have any information other than he's wearing a yellow jacket and is occupying a or operating a '97 Pontiac that's [sic] he's getting tint on now." (Ex. B at 2).

While Officers DeBonavetura and Hazzard, along with other assisting officers, were en route to the scene, Sergeant George Taylor radioed Sergeant Robert Donovan, a Wilmington Police Department detective, to inquire about his recollection of a homicide on December 31, 2007. (Id. at 3; Tr. at 6). Sergeant Donovan responded that he did not remember a homicide occurring on the night of December 31.[4]

Once at the corner of 12th and Bowers Streets, Officer DeBonavetura observed Defendant sitting in the Pontiac Bonneville. (Tr. at 15). At that time, Mr. Coverdale was still at the scene and "pointing to the defendant, saying, [']that's him, that's the guy that shot my son.[']" (Id. at

---

[2] All references to "Tr." refer to the transcript of the August 13, 2008 hearing on Defendant's Motion.

[3] The recording of Mr. Coverdale's 911 call does not indicate that he stated that his son was killed in the December 31 shooting. See Ex. A.

[4] During the hearing, Defense counsel raised question about the accuracy of the transcription of Sergeant Donovan's response.(Tr. at 25). Regardless of whether Sergeant Donovan began his response with the words "I don't," he clearly responded in the negative to the question of whether he *remembered* a homicide occurring on December 31, as opposed to a question of whether a homicide did in fact occur. (Ex. B at 3). Moreover, these semantics have no bearing on the veracity of the information provided by Mr. Coverdale, who did not state that his son had been killed.

16). The officers then approached the defendant and asked him to step out of the car. (Id. at 16-17). According to Officer DeBonaventura, Defendant Bland was asked to step out of the car "to make sure he didn't have a firearm or any type of weapon on him for [Officer DeBonaventura's] safety and the safety of the rest of [his] fellow officers." (Id. at 17). Officer DeBonaventura then asked defendant to turn around and place his hands on the roof of the car. (Id. at 17). Defendant complied. Officer DeBonaventura then asked the defendant if he had anything that was going to hurt him. (Id.). Defendant responded, "yeah, I got a gun." (Id.). As Office DeBonaventura explained at the hearing, "[Defendant] took his left hand off the roof of the car and reached for his gun, at which time, I placed my elbow in the small of his back and pushed him against the car, at which time, Officer Hazzard secured the weapon." (Id.).

After the firearm, a Hi-Point, model C-9 9mm pistol, was recovered, Defendant was taken into police custody. (Id. at 19). Following this sequence of events, Officer Hazzard made contact with Mr. Coverdale, who confirmed that he was the individual who made the 911 call. (Id.).

## LEGAL ARGUMENT

The investigative stop and frisk of Defendant Bland was lawful. WPD officers responded to a detailed 911 call from an individual who identified himself, provided information regarding a completed crime, and supplied a description of the suspect who was believed to have committed the completed crime. Combined with the informant's presence and further identification of the suspect at the scene of the stop, the officers had the necessary reasonable suspicion to engage in a Terry stop of Defendant.

A. **The Informant's 911 Tip Possessed Sufficient Indicia Of Reliability To Give The Officers Reasonable Suspicion Sufficient to Justify A *Terry* Stop**

Under Terry v. Ohio, 392 U.S. 1 (1968), "an officer may, consistent with the Fourth Amendment, conduct a brief, investigatory stop when the officer has a reasonable, articulable suspicion that criminal activity is afoot." Illinois v. Wardlow, 528 U.S. 119, 123, (2000) (citation omitted). Additionally, law enforcement officials may conduct a Terry stop based upon a reasonable suspicion "that a person they encounter was involved in or is wanted in connection with a completed felony." United States v. Hensley, 469 U.S. 221, 229(1985); see also Michigan v. Summers, 452 U.S. 692, 699 (1981) (holding that certain seizures are justifiable "if there is articulable suspicion that a person *has committed* or is about to commit a crime.") (emphasis added). Here, the officers' reasonable suspicion was based on facts conveyed by an informant. The informant in this case had specific knowledge of the facts of a previous crime as well as a then-current location of a suspect in that crime.

"A reasonable suspicion may be the result of any combination of one or several factors: specialized knowledge and investigative inferences ..., personal observation of suspicious behavior ..., information from sources that have proven to be reliable, and information from sources that-while unknown to the police-prove by the accuracy and intimacy of the information provided to be reliable at least as to the details contained within that tip." United States v. Nelson, 284 F.3d 472, 478 (3d Cir. 2002) (internal citations omitted). The reasonable suspicion standard is lower than the probable cause needed to arrest an individual. Santiago v. City of Vineland, 107 F.Supp.2d 512, 565 n. 41 (D. N.J. 2000). Where, as here, officers are told to investigate a situation by a police dispatcher, "the court must look beyond the specific facts

known to the officers on the scene to the facts known to the dispatcher." United States v. Torres, – F. 3d –, 2008 WL 2813035 at *2 (3d Cir. Jul. 23, 2008).

Unlike the large body of caselaw involving anonymous informants, the WPD dispatcher in this case received detailed information from an informant who identified himself during the call. "[O]ne of the characteristics of a known informant [, as opposed to an anonymous caller,] that contributes to reliability is that he or she can be held responsible if the allegations turn out to be fabricated." U.S. v. Nelson, 284 F.3d 472, 482 (3d Cir. 2002) (citing Florida v. J.L., 529 U.S. 266, 270 (2000). By identifying himself to the 911 operator, Mr. Coverdale exposed himself to certain risks if his claims were found to be false. See 11 Del. C. §1245 (misdemeanor offense of falsely reporting an incident).

Additional indicia of the informant's reliability include the presence of information that would not be available to any observer and the tip's ability to predict what will follow. See United States v. Brown, 448 F.3d 239, 249-50 (3d Cir. 2006). Here, Mr. Coverdale supplied the 911 dispatcher with information that the individual believed to have shot his son was at the tint shop at 12th and Bowers Street. (Ex. B at 1). This information would not be available to any observer and was capable of being tested for its reliability, and at the same time, Mr. Coverdale could be held accountable if it were found not to be reliable. See United States v. Quarles, 330 F.3d 650, 656 (4th Cir. 2003) (finding informant reliable for purposes of reasonable suspicion determination where informant provided his name, detailed and precise information about the defendant, and specific information regarding an investigation of a past crime allegedly committed by defendant). Additionally, Mr. Coverdale provided a description of Defendant's yellow coat and his automobile, both facts which were confirmed by the officers who reported to

the scene. (Ex. B at 2; Tr. at 8). Supplied with the information from Mr. Coverdale, the WPD officers possessed the reasonable suspicion necessary to perform an investigative stop on Defendant once they arrived at the scene.

### B. The Officers' Observations At The Scene Further Supported Their Reasonable Suspicion To Engage In An Investigative Stop

Upon their arrival at 12th and Bowers Streets, the WPD officers observed a gray Pontiac Bonneville in the middle of the dirt parking lot of the tint shop. (Tr. at 8). Just as Mr. Coverdale indicated in his 911 call, a man wearing a yellow jacket was sitting in that car. (Id.). Mr. Coverdale was also still at the scene and was pointing to Defendant Bland indicating that he was the individual that shot his son. (Id. at 9). As Officer DeBonaventura explained, "[Mr. Coverdale] was like upset. He was like acting kind of like frantic. He was pointing to the car and saying that's him, that's him." (Id.). This scene was especially significant to Officer Debonaventura in that he had "never seen [a complainant] stand around and just point somebody out like that." (Id. at 18). Given Mr. Coverdale's demeanor at the scene and his description of the situation, Officer DeBonaventura found Mr. Coverdale's claims "very credible" and proceeded to approach Defendant. (Id.).

These observations strengthened the officers suspicion and provided greater justification for an investigative stop. The officers had an opportunity to have a face-to-face encounter with the informant to assess his credibility and demeanor. See United States v. Christmas, 222 F.3d 141, 144 (4th Cir. 2000) (finding face-to-face encounter with informant helpful in assessing reliability of informant). As Officer DeBonaventura testified, Mr. Coverdale's frantic demeanor indicated he was in fact pointing out the individual believed to have shot his son, and that Mr.

7

Coverdale probably knew this through conversations with his son. (Tr. at 18). This emotional reaction made it more likely that the tip was reliable and had a factual basis.

Once the officers established the reasonable suspicion to stop and question Defendant Bland, they approached his vehicle and asked him to step out of the vehicle. "[P]rotection of police and others can justify protective searches when police have a reasonable belief that the suspect poses a danger." Michigan v. Long, 463 U.S. 1032, 1049 (1983). Furthermore, while Defendant's Motion appears to argue otherwise (Mot. ¶3), any individual stopped for questioning pursuant to Terry may also be frisked. Burbage v. City of Wilmington, 461 F.Supp.2d 236, 242 (D. Del. 2006) ("Terry recognized that in order to continue the investigation without fear of violence, a police officer may conduct a pat down or frisk of the individual."). Here, as Officer DeBonaventura explained, the officers "were going [to the scene] for a homicide suspect. [He] wanted make sure that the area was secure for [his] safety. [He] didn't know if [Defendant Bland] had a weapon on him or not." (Tr. at 17).

The officers did not immediately frisk Defendant Bland, however. With his hands on the roof of his car, Defendant Bland indicated to the officers that he had a gun on his person. (Id.). At this point, the officers had probable cause to arrest Defendant for Carrying a Concealed Deadly Weapon. See 11 Del. C. §1442. After hearing that the he had a gun, the officers frisked Defendant Bland and removed the gun from his waistband. By engaging in this protective weapons search, the officers lawfully ensured their safety and the safety of others, and were then in a position to continue their investigation. (Id. at 18-19).

### C. Communications With Sergeant Donovan Did Not Diminish The Officers' Reasonable Suspicion

Defendant appears to argue that Sergeant Donovan's statement to Sergeant Taylor that he did not recall a homicide occurring on December 31, 2007, somehow invalidated the reasonable suspicion developed through Mr. Coverdale's tip and the officer's observations at 12th and Bowers Streets. (Id. at 23-25). This argument is flawed on many levels. First, Sergeant Donovan did not state that there was not a homicide on December 31, only that he did not recall one occurring on that date. (Ex. B at 3). Second, Mr. Coverdale never indicated that his son was killed. Regardless of what the dispatcher communicated to the WPD officers, "the knowledge of the dispatcher is imputed to the officers in the field when determining the reasonableness of the Terry stop." Torres, 2008 WL 2813035 at *2. The dispatcher knew that a frantic Mr. Coverdale was reporting the location of the man he believed to have shot his son. (Ex. B at 1).

Rather than parsing the words of informants, dispatchers, and officers, as the Third Circuit recognizes, courts should not "fault the officers' choice to forgo extensive credibility checking in order to quickly respond. The business of policemen and firemen is to *act*, not speculate or meditate on whether the report is correct. People could well die in emergencies if police tried to act with the calm deliberation associated with the judicial process." Torres, 2008 WL 2813035 at *5 (quoting United States v. Sanchez, 519 F.3d 1208, 1211 n. 1 (10th Cir.2008) (emphasis in original)). The WPD officers acted accordingly in the present case as they received a credible tip from a known informant, further confirmed that credibility at the scene, and proceeded to engage in an investigative stop and frisk which resulted in the discovery of a gun.

## CONCLUSION

**WHEREFORE,** the United States respectfully requests that the Court deny Defendant's Motion to Suppress.

Respectfully submitted,

COLM F. CONNOLLY
UNITED STATES ATTORNEY

BY: */s/ Geoffrey G. Grivner*

John C. Snyder
Assistant United States Attorney

Geoffrey G. Grivner
Special Assistant United States Attorney

Dated: August 25, 2008