IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

UNITED STATES OF AMERICA,          :
                                   :
          Plaintiff,               :
                                   :
     v.                            :  Criminal Action No. 08-37-JJF
                                   :
IRA BLAND,                         :
                                   :
          Defendant.               :
                                   :

Colm F. Connolly, Esquire, United States Attorney, and John C. Snyder, Esquire, Assistant United States Attorney, of the OFFICE OF THE UNITED STATES ATTORNEY, Wilmington, Delaware.

Attorney for Plaintiff.

Christopher S. Koyste, Esquire of Christopher S. Koyste, LLC, Bellefonte, Delaware.

Attorney for Defendant.

**MEMORANDUM OPINION**

September 30, 2008
Wilmington, Delaware

Farnan, District Judge. *Joseph J. Farnan Jr.*

Pending before the Court is Defendant Bland's Motion To Suppress All Evidence Obtained As A Result Of His Unlawful Stop And Frisk (D.I. 24). For the reasons discussed the Court will deny the Motion.

I. BACKGROUND

On March 4, 2008, Defendant, Ira Bland, was charged by Indictment with one count of being a felon in possession of a firearm in violation of 18 U.S.C. §§ 922(g)(1) and 924(a)(2). On July 8, 2008, Mr. Bland filed the instant Motion contending that the warrantless stop and frisk of his person on February 9, 2008, was illegal. Specifically, Mr. Bland raised two issues: (1) whether he was seized within the meaning of the Fourth Amendment when Patrolman DeBonaventura requested that he exit his vehicle and place his hands on the roof of the car, and (2) if a seizure occurred, whether reasonable suspicion existed for the stop and frisk.

On August 13, 2008, the parties appeared before the Court for a Suppression Hearing in connection with the Motion. At the hearing, the Government essentially conceded that the stop of Mr. Bland amounted to a Fourth Amendment seizure and focused its argument instead on the second issue concerning whether the stop and frisk was supported by reasonable suspicion. Post-hearing briefing has been completed, and therefore, this matter is ready

1

for the Court's decision.

**II. FINDINGS OF FACTS**

    1.   On February 9, 2008, at approximately 2:45 p.m., Patrolman DeBonaventura and Patrolman Hazzard received a call from the 911 dispatcher requesting officers to respond to the area of 12th and Bowers, in regard to the presence of a possible homicide suspect wearing a yellow jacket and sitting in a gray colored Pontiac Bonneville in front of the tint shop at that location.  (Tr. at 5, 6.)

    2.   The dispatcher also informed the officers that the alleged homicide occurred on December 31, 2007, and that the 911 complainant was named Kevin Coverdale.  (Tr. 5.)

    3.   Patrolman DeBonaventura and Patrolman Hazzard responded to the scene along with Sergeant Murray and Officers Donohue and Schupp.  (Tr. 6.)

    4.   With the exception of a radio call placed by Sergeant Taylor to Sergeant Donovan in the Detective Division, the remaining responding officers did not attempt to verify the information provided by Mr. Coverdale in the 911 call, which formed the basis for the 911 dispatch.  (Tr. 6.)

    5.   In his radio transmission, Sergeant Taylor asked Sergeant Donovan if a homicide had occurred on December 31st.  Patrolman DeBonaventura overheard Sergeant Donovan's radio transmission prior to arriving on the scene.  Patrolman

2

DeBonaventura testified that Sergeant Donovan was uncertain and was out of the office and would need to confirm. (Tr. 6, 15.)

    6.    The actual transcript of the radio transmission provides, in pertinent part:

| | |
|---|---|
| C2 | Hey Bob it's George, we're . . . I'm on my way over the area of uh 12th and uh Bowers. Allegedly the suspect from a homicide on the uh 31st of December is allegedly there. Do we have a uh IX that night do you remember? |
| Sgt. Donovan | I don't I was on call that uh New Year's and no. |
| C2 | Alright copy, (CU) WilCOM. Got the information WiCOM got we're going over there now just to check this guy out. |
| C2 | Okay thank you. |
| Sgt. Donovan | I'm out of the office George uh I'll be heading back there in a few minutes and I'll check the book to see if there's anything close. |

(Govt. Exh. 2.)

    7.    Upon arriving at the location, which Patrolman DeBonaventura knew to be a high crime location, he observed a gray Pontiac Bonneville parked west of the garage doors in the middle of the dirt lot facing northbound with the front driver's side door open. (Tr. 7, 8.) Patrolman DeBonaventura also observed the suspect, Mr. Bland, wearing a yellow jacket and black pants and sitting in the driver's seat with one leg hanging out of the car. (Tr. 8.)

    8.    Patrolman DeBonaventura also observed Mr. Coverdale, the 911 caller, present in the middle of the lot looking upset and frantic and pointing toward Mr. Bland saying things like "that's the guy that shot my son," and "that's him, that's him." (Tr. 9.)

    9.    Mr. Coverdale never indicated that Mr. Bland had a firearm on his person or in his possession, and Patrolman DeBonaventure knew that the homicide that was referred to in the 911 call had occurred weeks ago.  (Tr. 27.)

    10.    Patrolman DeBonaventura opined that Mr. Bland could easily see Mr. Coverdale in the lot from his vantage point. Patrolman DeBonaventure also testified that he had never, in his experience, seen a complainant turning in a suspect in that fashion, i.e. out in the open in front of the suspect.  (Tr. 17-18.)

    11.    Given Mr. Coverdale's demeanor and presence at the location, Patrolman DeBonaventure testified that he found Mr. Coverdale's claim against Mr. Bland to be "very credible."  (Tr. 18.)

    12.    Patrolman DeBonaventura approached the Pontiac Bonneville with Patrolman Hazzard on his left and Sergeant Murray on his right.  Tr. 16.  Patrolman DeBonaventura did not have his gun drawn and neither did any of the other officers.  (Tr. 18.)

    13.    Patrolman DeBonaventura did not observe any illegal

substances or contraband in plain view as he approached the vehicle.  (Tr. 29.)

    14.  Patrolman DeBonaventura asked Mr. Bland to step out of the vehicle.  Mr. Bland complied with Patrolman DeBonaventura's request.  (Tr. 17, 28.)

    15.  Patrolman DeBonaventura did not ask Mr. Bland any questions before asking him to exit the vehicle and could not judge his demeanor before ordering him to exit.  (Tr. 27, 30.)

    16.  Then, Patrolman DeBonaventura asked Mr. Bland to turn around and place his hands on the roof of the car.  Mr. Bland again complied.  (Tr. 17.)

    17.  Before conducting a frisk, Patrolman DeBonaventura asked Mr. Bland if he had anything "that's going to hurt me." (Tr. 17.)  At that point, Mr. Bland responded "yeah, I got a gun."  (Tr. 17.)  After advising Patrolman DeBonvanetura about the gun, Mr. Bland then moved his left hand off the roof of the car and reached for his gun.  At that time, Patrolman DeBonaventura placed his elbow into the small of Mr. Bland's back and pushed him up against the car.  Patrolman Hazzard secured the weapon, which was a .9 millimeter Highpoint.  (Tr. 17, 19.)

    18.  Patrolman DeBonaventura testified that he did not approach Mr. Coverdale when he arrived on the scene because he was responding to the possible presence of a homicide suspect and wanted to make sure the area was secured for safety purposes by

first identifying the suspect and asking if he had any weapons. (Tr. 17-18, 30.)

    19.    Mr. Bland was taken into custody after Patrolman Hazzard secured the weapon.  (Tr. 19.)

### III. CONCLUSIONS OF LAW

    1.    The Fourth Amendment to the United States Constitution protects "the right of the people to be secure against unreasonable searches and seizures. . . ."  U.S. Const. Amend. IV.

    2.    The Supreme Court has held that stopping a car and detaining its occupants is a seizure under the Fourth Amendment, "'even though the purpose of the stop is limited and the resulting detention quite brief.'"  U.S. v. Delfin-Colina, 464 F.3d 392, 396 (3d Cir. 2006) (quoting Delaware v. Prouse, 440 U.S. 648, 653 (1979)).

    3.    Generally, for a seizure to be reasonable under the Fourth Amendment, it must be effectuated with a warrant based on probable cause.  Warrants are not required in certain limited circumstances.  Evidence derived from an illegal search may not be used at trial and is considered "fruit of the poisonous tree." Wong Sun v. United States, 371 U.S. 471, 487-88 (1963).

    4.    Police are vested with the constitutional authority to conduct a limited, warrantless, investigatory stop of a person in a public place if an officer has a reasonable suspicion that

criminal activity is afoot. Terry v. Ohio, 392 U.S. 1, 30 (1968). Reasonable suspicion of criminal activity includes a reasonable suspicion, based on articulable facts, that that person has committed, or is in the process of committing, a criminal act. See e.g., Hayes v. Florida, 470 U.S. 811, 816, (1985).

   5.   The Government carries the burden of establishing that reasonable suspicion justified the Terry stop and frisk. U.S. v. Hall, 270 Fed. Appx. 123, 125 (3d Cir. 2008) (citing Delfin-Colina, 464 F.3d at 397).

   6.   Reasonable suspicion "requires a showing considerably less than preponderance of the evidence," however, the "officer must be able to articulate more than an 'incohate and unparticularized suspicion or hunch.'" Illinois v. Wardlow, 528 U.S. 119, 675 (2000). Rather, reasonable suspicion requires that "the detaining officers must have a particularized and objective basis for suspecting the particular person stopped of criminal activity." United States v.. Cortez, 449 U.S. 411, 417-18 (1981).

   7.   While Fourth Amendment jurisprudence demands particularized suspicion, courts also recognize that officers must be allowed "to draw on their experience and specialized training to make inferences from and deductions about the cumulative information available to them that might well elude an

untrained person." United States v. Arvizu, 534 U.S. 266, 273 (2002). Reasonable suspicion is to be viewed from the vantage point of a "reasonable, trained officer standing in [the detaining officer's] shoes." Johnson v. Campbell, 332 F.3d 199, 206 (3d Cir. 2003). In determining reasonable suspicion, "it is imperative that the facts be judged against an objective standard: would the facts available to the officer at the moment of the seizure or the search 'warrant a man of reasonable caution in the belief' that the action taken was appropriate?" Terry, 392 U.S. 21-22.

8.   Whether the police have reasonable suspicion is determined from the totality of the circumstances, which includes "any combination of one or several factors: specialized knowledge and investigative inferences . . ., personal observation of suspicious behavior . . ., information from sources that have proven to be reliable, and information from sources that - while unknown to the police-prove by the accuracy and intimacy of the information provided to be reliable at least as to the details contained within that tip . . . ." United States v. Nelson, 284 F.3d 472, 478 (3d Cir. 2002).

9.   When officers are following a police dispatcher's directive to investigate a situation, "the court must look beyond the specific facts known to the officers on the scene to the facts known to the dispatcher. United States v. Torres, 534 F.3d

207, 210 (3d Cir. 2008). Stated another way, "the knowledge of the dispatcher is imputed to the officers in the field when determining the reasonableness of the Terry stop." Id.

10. When an unknown caller provides a tip, the Court must consider whether the tip "possessed sufficient indicia of reliability, when considering the totality of the circumstances, . . . to conclude that the officers possessed an objectively reasonable suspicion sufficient to justify a Terry stop." Id. at 211.

11. Specific aspects of a tip justifying its reliability include: (1) face-to-face interaction with the tipster so that the officer has the opportunity to appraise the tipster's credibility through observation; (2) the tipster can be held responsible if the allegations provided are fabricated; (3) the content of the tip is not information that would be available to any observer; (4) the tipster has recently witnessed the criminal activity alleged; and (5) the tip "predicts what will follow," which provides the police with the means to test the informant's knowledge or credibility. Id.

12. Other factors which can bolster an otherwise insufficient tip include the presence of the suspect in a high crime area or on a street at a late hour; the suspect's flight from the police; or other nervous or evasive behavior by the suspect. Id.

9

13. Based on the evidence and testimony adduced at the hearing, the Court concludes that the Government has established that reasonable suspicion supported the investigative <u>Terry</u> stop and frisk of Mr. Bland. Patrolman DeBonaventura was instructed to respond to a location known as a high crime area, to investigate an individual alleged to have been involved in a homicide. The location of the suspect and the description of him were provided to police by a caller to 911 who identified himself by name and identified the victim as his son, and the date of his son's death as December 31. In addition, the caller, Kevin Coverdale, remained at the location of the supsect until the officers arrived.

14. Mr. Bland suggests that Patrolman DeBonaventura knew that no homicide had occurred on December 31st, the date provided by the 911 caller, because he heard the conversation between Sergeant Taylor and Sergeant Donovan, who indicated that no homicide had occurred. The Court views the testimony differently. After hearing the radio transmission played during the suppression hearing, the Court finds that Sergeant Donovan responded "I don't" to the question of whether he <u>remembered</u> a homicide on the night of December 31st, and that his follow-up with the word "no" was again a reiteration of the fact that he couldn't remember for certain whether there was a homicide reported or not. The nature of Sergeant Donovan's uncertainty is

further apparent in his subsequent statement that he was out of the office and would have to "check the book to see if there's anything close." (Govt. Exh. 2.) In the Court's view, the exchange between Sergeant Taylor and Sergeant Donovan, which was overheard by Patrolman DeBonaventura, did not negate the information provided by the 911 caller, or the knowledge of the investigating officers dispatched to the location of Mr. Bland.

15.   In addition, the Court concludes that Mr. Coverdale's call to 911 provided sufficient indicia of reliability to provide Patrolman DeBonaventura with reasonable suspicion to approach Mr. Bland to investigate whether he was involved in the December 31st shooting. In this regard, Mr. Coverdale, identified himself by name to the dispatcher, exposing himself to the risk that he could be held responsible for providing a false report. See 11 Del. C. § 1245 (misdemeanor offense of falsely reporting an incident). The information provided by Mr. Coverdale was not refuted by Sergeant Donovan as discussed above, and the factual details relayed by Mr. Coverdale in his 911 call were borne out when officers arrived on the scene and discovered not only Mr. Coverdale's presence at the location, but also a man in a yellow jacket in a Pontiac Bonneville at the tint shop, exactly as Mr. Coverdale described to the dispatcher. See United States v. Brown, 448 F.3d 239, 249-250 (3d Cir. 2006) (recognizing reliability of tips by an identified caller who provides specific

11

details of the activity, has first hand knowledge of the activity and whose information "predicts what will follow"); United States v. Quarles, 330 F.3d 650, 656 (4th Cir. 2003) (finding tip reliable where informant provided his name, and details about the defendant, including his involvement in a past crime).

    16.  Although Mr. Coverdale did not provide the initial tip to Patrolman DeBonaventura in a face to face interaction, Mr. Coverdale's presence at the scene when Patrolman DeBonaventura arrived provided Patrolman DeBonaventura with the opportunity to observe Mr. Coverdale's demeanor and attitude in circumstances analogous to that which you would expect from a face-to-face tipster.  See e.g., Torres, 534 F.3d at 211; United States v. Christmas, 222 F.3d 141, 144 (4th Cir. 2000) (recognizing that face-to-face encounters with informant make tips more trustworthy and reliable than anonymous tips).  Patrolman DeBonaventura testified that Mr. Coverdale was frantic and upset when he arrived on the scene, and was pointing to Mr. Bland identifying him as the man who shot his son.  Based on the testimony of Patrolman DeBonaventura which the Court finds credible, as well as the other indicia of reliability supporting the tip provided by Mr. Coverdale as discussed above, the Court concludes that Patrolman DeBonaventura had reasonable suspicion to believe that Mr. Bland was the suspect of a possible shooting and/or homicide, and therefore, the Court concludes that Patrolman DeBonaventura

had reasonable suspicion to approach, stop, and question Mr. Bland.

17.   Mr. Bland further contends that the subsequent frisk of his person was unwarranted.  It is well-established that an officer, for his own protection and safety, may conduct a patdown to find weapons that he reasonable believes or suspects are in the possession of a person he has stopped.  <u>Ybarra v. Illinois</u>, 444 U.S. 85, 92-93 (1979).  Mr. Bland contends that because Patrolman DeBonaventura knew there was no exigency and that the shooting had occurred weeks before this incident, it was unreasonable for Patrolman DeBonaventura to suspect that Mr. Bland was in possession of a firearm at the time of the stop. However, the Court concludes that, given the information that the 911 call involved a shooting and/or homicide suspect, Patrolman DeBonaventura was not unreasonable in believing, as he testified, that Mr. Bland was armed.

18.   Moreover, even though Patrolman DeBonaventura intended to conduct a frisk of Mr. Bland when he ordered him to get out of the vehicle and place his hands on the roof of the car, Patrolman DeBonaventura did not actually engage in the frisk immediately. He first asked Mr. Bland if he had anything on his person "that's going to hurt me."  Once Mr. Bland responded that he had a gun on his person, the officers clearly had the right to remove the gun and frisk Mr. Bland.

## IV. CONCLUSION

For the reasons discussed, the Court will deny Mr. Bland's Motion To Suppress Evidence And Statements.

An appropriate Order will be entered.